*The probate of the two papers propounded as the Will of* ANN MARIA FORMAN.

Two instruments, executed and attested at the same time, may constitute the will of a testator, and may be admitted to probate as such, notwithstanding their repugnance in certain particulars.

The tearing up of a will is not to be considered a revocation, if the testator was at the time under such mental excitement as incapacitated her from forming a reasonable and intelligent intention to revoke her will.

> EDWARDS PIERREPONT *and* A. A. REDFIELD, *for Proponent.*
> A. W. BRADFORD, PHILIP REYNOLDS *and* H. A. CRAM, *for Contestants.*

THE SURROGATE. Ann Maria Forman was the only child by his first wife, of Mr. George Sutton, a wealthy gentleman who died in 1855. Some time before his death Mr. Sutton gave his daughter, by deed and conveyance, the bulk of his estate, and on his death left her the residue of his property by will, after making some provision for his widow (a second wife), and her daughter Rebecca, his only other child. In March, 1851, Ann Maria, being then forty-three years old, married Enos B. Forman, who survives her and now contests the probate of the instruments propounded as her will. Soon after her father's death, in 1855, Mrs. Forman made her first will, by which she gave to her husband the greater part of her property.

A second will was made in 1859, by which she gave to her husband less than before. In August, 1861, she made another will, by which she gave him still less. Six months afterwards, on February 27, 1862, she executed the two instruments now offered as her will, and which read as follows:

I, Ann Maria Forman, the wife of Enos B. Forman, of the city of New York, do make, publish and declare this to be my last will and testament in manner and form following, that is to say: First, I give and devise to the "Greenwood Cemetery," the burial lot devised to me by the will of my deceased father, known on the map of the grounds of the said Greenwood Cemetery, by the number (1174) eleven hundred and seventy-four, together with the vault constructed thereon, and also the burial lot adjoining the same, purchased by me since the death of my beloved father. In trust, nevertheless, to hold and possess the same, and to permit such improvements to be made thereon as I have herein directed to be made by my executor hereafter named, and to keep and preserve the same forever hereafter inalienable and inviolate, and in good order and condition, and to permit or allow no interments whatsoever to be made therein, excepting only such as my executor shall, in writing, require; and if this trust shall be accepted, then I hereby give and bequeath to the said, the "Greenwood Cemetery," the sum $250 in trust, to keep the same invested, and apply the income thereof to the repair and preservation of the said lots and vault, and the monument to be erected thereon. Second, I hereby order and direct my executor, out of the first money that shall come into his hands, to appropriate the sum of $500, or so much thereof as shall be necessary for the construction of a good and substantial iron fence, inclosing the two lots in Greenwood Cemetery belonging to me; and also the further sum of $1,000 to the construction of a monument there of white marble, upon which monument shall be inscribed the words:

"To the memory of George Sutton, son of the Reverend

Abner Sutton, who departed this life on the 18th of July, A. D. 1855, in the 83d year of his age.

"Have faith in the Bible. Trust in God.

"Blessed are the dead who die in the Lord."

Third, I give and bequeath all my wearing apparel, books and household furniture, unto my cousins Eliza Riley, Jane Westervelt, Elizabeth Cocks and Mary Coon, to be equally divided between them, share and share alike. Fourth, I give, devise and bequeath to George Sutton, the son of my late uncle, David Sutton, the term of years yet to come and unexpired, in and to the house and lot of land situated on the northerly side of Canal street, next adjoining and west of the house and lot at the north-westerly corner of Canal and Sullivan streets, in the said city of New York, which said lot, together with the said adjoining lot, were leased by the ministers, elders and deacons to my late father, said elders, &c., of Trinity Church in the city of New York; and I also give and bequeath to the said George Sutton, all right and title to a further term, or for the payment or compensation for the buildings on the lot, the term in which is hereby bequeathed, contained in the lease of said premises from the said ministers, &c., of Trinity Church. Fifth, I give and bequeath to Enos B. Forman, $1,000; he has had largely from the property. Sixth, I hereby give and bequeath to George Sutton, the son of my said cousin, George Sutton, the sum of $1,000. Seventh, I give and bequeath to David Sutton, son of my said cousin, George Sutton, the sum of $1,000. Eighth, I give and bequeath to Josephine Sutton, daughter of my said cousin, George Sutton, the sum of $1,000. Ninth, I give and bequeath to Samuel D. Sutton, grandson of my late uncle, David Sutton, the sum of $1,000. Tenth, I give and bequeath to Eliza Riley, the wife of James Riley, and daughter of my late uncle, David Sutton, the sum of $1,000. Eleventh, I give and bequeath to Maria McKenzie, widow of George McKenzie, and daughter of

my late uncle, David Sutton, the sum of $1,000. Twelfth, I give and bequeath to my cousin, Elizabeth Cocks, the daughter of my late aunt, Ann Cocks, $1,000. Thirteenth, I give and bequeath to my aunt, Phebe Kipp, widow of the late Benjamin Kipp, $1,000. Fourteenth, I give and bequeath to my aunt, Amy Kipp, widow of the late Thomas Kipp, $1,000. Fifteenth, I give and bequeath to Amy Sutton, my stepmother, the sum of $1,000. Sixteenth, I give and bequeath to Elizabeth Forman, mother of Enos B. Forman, $400. Seventeenth, I give and bequeath to Sarah Forman, daughter of Elizabeth Forman, $400. Eighteenth, I give and bequeath to John R. Davison, of Newark, a cousin of my father, $1,000. Nineteenth, I give and bequeath to Jane Westervelt, wife of Cornelius Westervelt, $1,000. Twentieth, I give and bequeath to David Coon, a cousin, $400, to his sister $400 (each). Twenty-first, I give and bequeath to Mary Coon, daughter of David Coon, $400. Twenty-second, I give and bequeath to Margaret Cross, of Basking Ridge, $200 ; to her uncle, Peter Cross, $200. Twenty-third, I give and bequeath to the Baptist Education Society, at Hamilton, for the ministry, $400. Twenty-fourth, I give and bequeath to the Rochester Theological Seminary, $400. Twenty-fifth, I give and bequeath to the Seaman's Bethel, of which Ira Stewart is chaplain, $400. Twenty-sixth, I give and bequeath to the Twenty-third street Baptist Church, of which Mr. Gillette is pastor, $1,000; to the Church of which Mr. Dowling is pastor, $1,000 ; to the Church of which Mr. Armitage is pastor, $1,000 ; I give and bequeath to the Seaman's Bethel, of which Ira Stewart is chaplain, the sum of $400. I give, devise and bequeath all the rest, residue and remainder of my estate, real and personal, whatsoever, and wheresoever, as well that which I now have, as that which I may hereafter acquire and die possessed of or entitled to, after the payment of all the above legacies, and including such thereof as may have become lapsed

by death or otherwise, unto my cousins, George Sutton and George Sutton, Jr., Eliza Riley, Jane Westervelt, to have and to hold the same pro rata in the same relative shares and proportions as the amounts of the respective specific cash legacies which I have hereinbefore bequeathed to them respectively. If either of them, my residuary legatees and devisees above named, shall die before me, leaving issue, then I give, devise and bequeath the part, share and proportion of my said residuary estate, given to him or her so dying, unto his or her issue; if, however, any or either of them shall die before me, without leaving issue surviving me, then I give, devise and bequeath the part, share and proportion of my said residuary estate, given to him or her so dying without leaving issue, unto the survivor or survivors of them, my said residuary devisees, and the issue of such of them as shall die before me, leaving issue, such issue to take the part or share his, her or their parent or parents would have been entitled to if living. I authorize and empower my said executor to sell and dispose of all my real estate, at such time and in such manner, and upon such terms as he shall think proper, and make, execute and deliver goods and sufficient deeds of conveyance to the purchasers or purchaser thereof, and to pay and apply the proceeds thereof for any of the purposes of this my will. Lastly. I hereby nominate and appoint Cornelius Westervelt, executor of this my will, and hereby revoke all former and other wills by me made.

In witness whereof, I have hereunto set my hand and seal the 27th of February, in the year of our Lord, one thousand eight hundred and sixty-two.

ANN MARIA FORMAN. [L. S.]

Signed, sealed, published and declared by the testatrix to be her last will and testament, in the presence of us, who, at her request, in her presence, and in the presence

of each other, have hereunto subscribed our names as witnesses.

> ELEANOR JANE WESTERVELT,
> MARIA SMITH.

I, Ann Maria Forman, the wife of Enos B. Forman, of the city of New York, do make, publish, and declare, this to be my last will and testament in manner and form following, that is to say : First, I give and devise to "the Greenwood Cemetery," the burial lot devised to me by the will of my deceased father, known on the map of the grounds of the said Greenwood Cemetery, by the number (1,174) eleven hundred and seventy-four, together with the vault constructed thereon, and also the burial lot adjoining the same, purchased by me since the death of my beloved father. In trust nevertheless to hold and possess the same, and to permit such improvements to be made thereon, as I have herein directed to be made by my executor hereafter named, and to keep and preserve the same forever, hereafter inalienable and inviolate, and in good order and condition, and to permit or allow no interments whatsoever to be made therein, excepting only such as my executor shall in writing require ; and if this trust shall be accepted, then I hereby give and bequeath to the said, "the Greenwood Cemetery," the sum of two hundred and fifty dollars, in trust, to keep the same invested, and apply the income thereof to the repair and preservation of the said lots and vault, and the monument to be erected thereon. Second, I hereby order and direct my executor, out of the first money that shall come into his hands, to appropriate the sum of five hundred dollars, or so much thereof as shall be necessary for the construction of a good and substantial iron fence enclosing the two lots in Greenwood Cemetery belonging to me ; and also the further sum of $1,000 to the construction of a monument there, of white marble, upon which monument shall be inscribed the words :

" To the memory of George Sutton, son of the Reverend Abner Sutton, who departed this life on the 18th July, A. D. 1855, in the 83d year of his age.

" Have faith in the Bible. Trust in God.

" Blessed are the dead who die in the Lord."

Third, I give and bequeath all my wearing apparel and household furniture unto my cousins, Eliza Riley, Jane Westervelt, Elizabeth Cocks and Mary Coon, to be equally divided between them, share and share alike. Fourth, I give, devise and bequeath to George Sutton, the son of my late uncle, David Sutton, the term of years yet to come, and unexpired, in and to the house and lot of land, situated on the northerly side of Canal street next adjoining, and west of the house and lot at the northwesterly corner of Canal and Sullivan streets, in the said city of New York, which said lot, together with the said adjoining lot, were leased to my late father by the ministers, elders and deacons of Trinity Church, in the city of New York; and I also give and bequeath to the said George Sutton, all right and title to a further term, or for the payment or compensation for the buildings in the lot, the term in which is hereby bequeathed, contained in the lease of said premises from the said ministers, &c., of Trinity Church. Fifth, I give and bequeath to Enos B. Forman, $1,000; he has had largely from the property. Sixth, I hereby give and bequeath to George Sutton, the son of my said cousin, George Sutton, the sum of $1,000. Seventh, I give and bequeath to David Sutton, son of my said cousin, George Sutton, the sum of $1,000. Eighth, I give and bequeath to Josephine Sutton, daughter of my said cousin, George Sutton, the sum of $1,000. Ninth, I give and bequeath to Samuel D. Sutton, grandson of my late uncle, David Sutton, the sum of $1,000. Tenth, I give and bequeath to Eliza Riley, the wife of James Riley, and daughter of my late uncle, David Sutton, the sum of $1,000. Eleventh, I give and bequeath to Maria McKenzie, widow of George McKenzie, and daughter of my late

uncle, David Sutton, the sum of $1,000. Twelfth, I give and bequeath to my cousin, Elizabeth Cocks, the daughter of my late aunt, Ann, $1,000. Thirteenth, I give and bequeath to my aunt, Phebe Kipp, widow of the late Benjamin Kipp, $1,000. Fourteenth, I give and bequeath to my aunt, Amy Kipp, widow of the late Thomas Kipp, $1,000. Fifteenth, I give and bequeath to Amy Sutton, my stepmother, the sum of $1,000. Sixteenth, I give and bequeath to Elizabeth Forman, mother of Enos B. Forman, $400. Seventeenth, I give and bequeath to Sarah Forman, sister of Enos B. Forman, $400. Eighteenth, I give and bequeath to my cousin, David Coon, $400; to his sister $400 (each $400). Nineteenth, I give and bequeath to his daughter, Mary Coon, $400. Twenty, I give and bequeath to the Baptist Education Society for the Ministry, at Hamilton, $400. Twenty-first, I give and bequeath to the Rochester Theological Seminary, $400. Twenty-second, I give and bequeath to the Seaman's Bethel, of which Ira Stewart is chaplain, $400. Twenty-third, I give and bequeath to John R. Davison, a cousin of my father, resident of Newark, $1,000. Twenty-fourth, I give and bequeath to Jane Westervelt, wife of Cornelius Westervelt, $1,000. Twenty-fifth, I give and bequeath to Margaret Cross, of Basking Ridge, $200; to her uncle, Peter Cross, $200. Twenty-sixth, I give and bequeath to the Baptist Church, of which Mr. Gillette is pastor (church in Twenty-third street), the sum of $1,000; church of which Mr. Dowling is pastor, $1,000; church of which Mr. Armitage is pastor, $1,000. I give and bequeath to the Seaman's Bethel, of which Ira Stewart was chaplain, the sum of $300. I give, devise and bequeath all the rest, residue and remainder of my estate, real and personal, whatsoever and wheresoever, as well that which I now have, as that which I may hereafter acquire and die possessed of, or entitled to, after the payment of all the above legacies, and including such thereof as may have become lapsed by

death or otherwise, unto my cousins, George Sutton, and George Sutton, Junr., Eliza Riley, Jane Westervelt, Elizabeth Cocks, to have and to hold the same pro rata, in the same relative shares and proportions as the amounts of the respective specific cash legacies which I have hereinbefore bequeathed to them respectively. If either of them, my residuary legatees and devisees above named, shall die before me, leaving issue, then I give, devise and bequeath the part, share and proportion of my said residuary estate, given to him or her so dying, unto his or her issue, if, however, any or either of them shall die before me, without leaving issue surviving me, then I give, devise and bequeath the part, share and proportion of my said residuary estate given to him or her so dying without leaving issue unto the survivor or survivors of them my said residuary devisees, and the issue of such of them as shall die before me leaving issue, such issue to take the part or share his, her or their parent or parents would have been entitled to if living. I authorize and empower my said executor to sell and dispose of all my real estate, at such time, and in such manner, and upon such terms as he shall think proper, and make, execute and deliver goods and sufficient deeds of conveyance to the purchaser or purchasers thereof; and to pay and to apply the proceeds thereof for any of the purposes of this my will. Lastly, I hereby nominate and appoint S. Conover (Sen), hardware merchant, Broadway, No of this my will, and hereby revoke all former and other wills by me made. In witness whereof, I have hereunto set my hand and seal the 27th of February, in the year of our Lord, one thousand, eight hundred and sixty-two.

ANN M. FORMAN. [ L. S. ]

Signed, sealed, published and declared by the testatrix to be her last will and testament, in the presence of us, who, at her request, in her presence and in the presence

of each other, have hereunto subscribed our names as witnesses.

ELEANOR JANE WESTERVELT.<br>MARIA SMITH.

Thirteen months after the date of these papers, to wit, on the 28th March, 1863, the anniversary of her wedding day, Mrs. Forman was removed by her husband to a private lunatic asylum at Flushing, Queens county, where she died two years afterwards. She never had any children, nor any sister or brother of the whole blood. Her half-sister, Mrs. Rebecca Haviland, is her only heir-at-law and next of kin, and she unites with Mr. Forman, the husband, in contesting the probate.

Shortly after the death of his wife, Mr. Forman presented his petition for letters of administration as in case of intestacy, upon her goods and chattels, setting forth, as he was advised by his counsel, that she left no will. On the 6th of May, 1865, Mrs. Sarah A. Wright, a legatee named in the papers now propounded, petitioned for probate, and the torn portions of the two testamentary papers were produced by Mr. Forman and deposited with the Surrogate.

The questions which presented themselves upon this trial were these:

First. Could these two instruments, notwithstanding their repugnance in certain particulars, constitute together a will, and be admitted as forming together the will of the decedent?

Second. If they could be so admitted to probate, were they executed and attested in the manner required by the statute?

Third. Had the decedent testamentary capacity at the time of the execution of these papers?

Fourth. If these questions are all answered in the affirmative, the remaining question is, did the tearing to pieces of these two papers by the decedent, on or about

the 31st day of August, 1864, under the circumstances, and considering what was said and done at the time, constitute a revocation of them?

As to the first question, I must hold, in conformity with all my rulings on this subject, that the point of repugnancy or inconsistency in the contents of the two instruments cannot properly be raised in the proceedings for probate, except so far as that point may bear upon the question of mental soundness. The two instruments, if executed and attested at the same time, could constitute a will, and may be admitted to probate together as the will, notwithstanding their slight repugnancy in parts. The question of their construction cannot be gone into on the probate. That is a question to be raised and determined after probate, and when it is attempted to carry the instruments into effect, and to act under them, as a will.

As to the question of execution, I consider that the testimony of Eleanor Jane Westervelt and Maria Smith, the two subscribing witnesses, clearly proves the compliance with the provisions of the statute. The contestants do not contend that the instruments propounded were executed under any restraint or undue influence. There is no pretense that they were.

The following is the testimony on the execution.

Eleanor Jane Westervelt, called for proponents, testified:

Q. Did you know Ann Maria Forman? A. Yes, sir.

Q. Will you state what relation she is of yours? A. She is a first cousin of mine; our mothers were sisters.

Q. About the first of March, 1862, did you see Mrs. Forman in the presence of this lady, Miss Smith, who is now in the room? A. Yes, sir.

Q. At what place? A. At Mrs. Forman's, 55 Bank street.

Q. You were there, Mrs. Forman was there, and Miss Maria Smith, who is here in this room? A. We were; yes, sir.

Q. Did you see this paper shown you, marked No. 1, there? A. I saw the two papers there. That is the paper I signed.

Q. Did you sign your name to it at that time? A. Yes, sir; that is my signature. I saw Maria Smith place her signature there at the same time, after I placed mine.

Q. Did you see Mrs. Forman place her signature there? A. Yes, sir; previous to placing mine. I stood by her.

Q. You see the seal there; did you see her put that on? A. I saw her place the seal on the papers, after we had witnessed them, at the same time.

Q. How happened you to sign your name as a witness? A. She wished me to come and do so, the day before I done it.

Q. Did she make any declaration to you about what this paper was, and if so, what was it? A. She told me she had made her last will and testament, and she wanted me to come and witness them, and take possession of one copy, and take charge of it.

Q. That was the day before? A. Yes; when she handed me the paper she said: " Now, this is my last will, and you take it and lay it in a private drawer."

Q. Before you signed your name there, in the room, what did she ask you, to sign your name, as to what paper? A. To her will. She wished me to witness it.

Q. Did she tell you that this was her will? A. She did, sir.

Q. And then who signed it? A. First, herself; then myself, and then Maria Smith. We were together.

Q. At what time was this? A. It was after an early dinner; I should think likely between twelve and one.

Q. Do you remember what day of the week it was? A. I do not, distinctly.

Q. What part of March was it? A. It was the fore part of March, 1862.

*Cross-examined.*

Q. When you went in, were there any papers ? A. No, sir; there were no papers.

Q. Did Mr. Forman dine at home ? A. He did not. After dinner, then we went up stairs to the second story room, and then she brought out this will.

Q. Then she brought the papers out; where did she take them from ? A. She took them from off the bed. She had them placed there. They were lying on the bed.

Q. Where did she put them ? A. She took a small stand and sat it by the window, then turned and took these two papers and laid them on the stand.

Q. Was there a pen and ink there, or did she go out and get it ? A. She placed one, and then sat down and signed it.

Q. She placed the pen and ink on the table ? A. Yes, sir; and she then sat down and signed her name to both, and she then got up and asked me to set my name down on both the papers, and I done so. She then handed the papers to Maria, and she sat down and placed her signature under mine; all at the same time.

Q. That was done on both papers ? A. Yes, sir.

Q. Can you tell which paper you signed first ? A. No, sir.

Q. Or which she signed first ? A. No, I could not. They lay side by side.   * * *

Q. When she handed you one of these, what did she tell you to do with it ? A. She told me she would like me to take it home and place it in a private drawer, and say nothing to any one about it; that it was strictly confidential; to give it to no one except she called on me for it.   * * *

Q. Can you state which of these two was signed first ? A. No, I could not. They both lay on the table.

Q. Did she make any distinction as to these, when she declared it to be her will ? A. She did not.

Q. Or when she requested you to sign it ? A. No, sir.

Q. Did she use the word "copy," in this connection?
A. She did.

Q. How did she use that word? A. That is what she said; that Mr. Dunning had drawn her will, and she had taken two copies.

Maria Smith, called for proponents, testified:

Q. Look at this paper propounded; is that your signature? A. Yes, sir, that is my signature.

Q. Do you remember Mrs. Westervelt making her own? A. Yes, sir.

Q. Do you remember Mrs. Forman signing these papers? A. Well, she sat down; I did not see her sign them; she sat down to the table first.

Q. What did she tell you these papers were; what did she ask you to do? A. She did not say.

Q. How came you to sign your name? A. She asked me to come and sign some papers, or paper.

Q. Did she ask you to sign them as a witness? A. Yes.

Q. Did you sign them? A. Yes.

Q. And was she present, and Mrs. Westervelt present? A. Yes, sir, they were. It was before I came to the room that she asked me to come and sign papers.

Q. And you did sign them in the room, when they were all there? A. Yes, sir; she did not say as witness, but said: "Come and sign these papers; come and sign a paper or papers." This was before I came to the room, she asked me this question; not in the room. * * *

*Cross-examined.*

Q. I believe you stated that you remember signing these two papers to which your name is affixed? A. Yes, sir.

Q. How did you come to sign them; who spoke to you? A. Mrs. Forman.

Q. Where were you at that time? A. I was down stairs in the front basement.

Q. What did she say to you? A. She said she wanted me to come up and sign a paper or papers.

Q. What did you say, if anything, to that? A. I said I did not like to sign any papers, and I did not know what they were, or hear them read; she said it was her will; I didn't want to hear that read; and I said to her: "You ought to have a man to sign it, instead of me." And she said to me: "No matter, that I was just as good." * * *

Q. She said nothing after you had gone up stairs. A. No.

Q. State all she said? A. I have stated what she said.

Q. Will you repeat it? When you came into the room did she say anything, after you got into the room, about the paper? A. After we got in the room the paper was on the table. She sat to the table, and, after she stood up, Mrs. Westervelt sat down and signed the paper. Mrs. Westervelt handed me the pen and I signed it; and it was taken and laid on the bed; and Mrs. Forman asked Mrs. Westervelt: "How does it do?" and Mrs. Westervelt said: "Very well;" and I was signing the second one at the same time. As soon as I was through I walked out of the room.

Q. You have stated all that took place in the room? A. That is all that took place.

No person, then, was present, at the execution of these papers, except the decedent, and these two witnesses. Neither of the latter can tell us which was first executed. They were both signed first by the decedent, both then signed by the witness, Mrs. Westervelt, and both then signed by Maria Smith. If admitted at all, they must be admitted as together constituting the will; for there appears to be no way of distinguishing their execution.

As to the third question: Had the decedent testamentary capacity at the time of the execution? This is the main question in the case, and the one to which nearly all the evidence contained in two great printed volumes relates. The contestants endeavor to prove the decedent's

insanity at that time, by the testimony of witnesses who are not experts; by the testimony of physicians; and by the speechless testimony of the stones, kites, &c., brought forward and introduced on the trial.

The principal witnesses who undertake to prove insanity, in the month of February, are Mr. Forman, the husband, and Maria Smith, his servant. Mr. Forman's own testimony may be almost said to be the only testimony which absolutely maintains her insanity at that time. I am not favorably impressed with his conduct, as detailed by himself. He was not justified in taking her to an asylum, a year after she had executed these papers; carrying her away by main force, and by the aid of the police, without any legal proceeding, without a full consultation with her family, and without the certificates of professional medical men. Her absolute seclusion from all visitors but himself, while in that asylum, for at least six months, does not look well. His going to Mrs. Wright and Mrs. Westervelt, getting from them the instruments now before me, and which his wife had given into their custody, and his taking them to his wife, in the asylum, where they were torn up by her; all this has a very unpleasant aspect, to say the least. I therefore take Mr. Forman's testimony with very considerable allowances. He has been anxious, while his wife was living, to make her appear insane, and his anxiety has apparently become more intense since her death.

Mrs. Forman lived a very uncomfortable and dissatisfied life with her husband. Although she had considerable means, her house was cold, cheerless and meanly kept. Her husband was engrossed in his business. She was lonely and secluded. Married late in life, with no children to bless their union, affection soon subsided into formality, and formality led to suspicion and hatred. With every year, she detested her husband more and more. She spoke contemptuously of him to her female friends. The successive wills she made gave him less and less of her estate.

Were these the beginnings of insanity; its earliest manifestations? Mr. Forman considers them so. But may there not be distrust, contempt and absolute loathing between married people, without insanity? This is a question by no means new or without precedent, in a Court which deals so constantly and so intimately with the affairs of families as a Court of Probate must do; and, it is sufficient for me to remark, that we unhappily find every day a great many people of perfectly sound mind, who thoroughly hate and despise their married partners.

Mrs. Forman's hatred and fear of her husband grew greater and greater. Ill health, and lack of employment and of amusement, aggravated the feelings with which she brooded upon his coldness and his penuriousness. They occupied separate apartments. They only met at meals. Scarcely a visitor entered the dull and quiet house. I do not see that the dissatisfaction of the decedent was in consequence of delusions; she had facts enough around her in her wretched life to make her discontented and indignant at him who controlled it. She believed he had married her for her money, and that he cared for that rather than for her. This is a dangerous conviction to lodge in a woman's mind. Any wife, under such a conviction, would hate any husband.

Mr. Forman lays much stress upon the singular conduct of his wife in gathering round stones or pebbles on the sea shore. With these she ornamented her back garden, placing them in rows along the edge of the beds. It was at most a harmless fancy. If it was a monomania, it would not incapacitate her for the making of a will. It does not seem to have had any effect upon her purposes in the disposition of her property. A monomaniac is not incompetent to make a will, if his mania does not touch or affect his testamentary acts. A believer in witchcraft may make a will. (*Re Thompson*, 2 *Brad. R.*, 449.)

The decedent had a fancy for making kites and banners, and plastering them with mottoes, about " the Union,"

"the War," &c; this was in the early days of the late civil war; and there is nothing remarkable in it, when we recall the popular excitements of that great national episode; soberer and older people than poor Mrs. Forman lent themselves to the terrible impulses which surged over our people in those days, and from which few, indeed, were exempt.

At the time of the making of the instruments now before me, the decedent explained rationally her intentions and wishes; and told Mrs. Wright why she gave to her one of them to take care of. She said: "I have lost confidence in my husband, because he does not render an account, and bring me my books, and because he does not let me know how the affairs are." And she gave the testamentary papers to her female friends to keep, "because," as she said, "Mr. Forman sacked the whole house to find these papers." These were the acts and declarations of a rational person.

I see no evidence to convince me that, at the time of the execution of these papers, the decedent was not of sound mind.

As to the question of intelligent revocation, on the 30th day of August, 1864; Mrs. Forman had then been in the insane asylum seventeen months; Mr. Forman had had an interview with her, in consequence of which he went to the house of Mrs. Wright.

Mrs. Wright says: "He came in, in quite a hurry, took a seat in the back parlor; we were through tea, and had all come up stairs, and were sitting on the piazza; Mr. Forman rang the bell and came in. I took a seat by the back parlor window, and he did too, and Mr. Wright sat by the center table. * * * I asked after Mrs. Forman, and he said he had been down to Flushing the day previous, and Mrs. Forman was quite comfortable, but she looked desponding, and he asked her what was preying on her mind, and she says, 'I wish you would call to Mrs. Wright's and get those papers I gave her;' and

when he said so I was very much excited, for I did not know what to do, and told him what she had told me. * * * I told him, when she handed me those papers, she told me to keep them until she called for them; perhaps she would call soon, and perhaps never, but to keep them. 'Well,' says he, 'if you are so reluctant about giving them to me, I will go down to-morrow and get an order from her;' and then I did not know what to do. Then he said, 'Is it possible that you have no more confidence in me?' Said I, 'Mr. Forman, I have confidence in you, but still I don't know what to do about giving you these papers.' I felt dreadfully about it. Then Mr. Wright said, 'I suppose they will be all right.' Mr. Forman, said, 'Certainly, certainly, it is all right,' and I went up stairs to get the papers. * * *. He (Forman) seemed to be very much pleased. He kept them in his hands until he went out of the front door." This was on Tuesday. "On Friday or Saturday morning, I had been out, and returning, I met him, and asked him if he had got the papers from Mrs. Westervelt, and he said he had, and I said, 'Did you have any trouble?' He said, 'No, of course not; I had no trouble at all.' Said I, Have you been down to Flushing to see Mrs. Forman?' He said, 'Yes; I was down yesterday.' I said, 'Did you give the papers to her?' He said, 'Yes, and she has destroyed them. Oh, those papers you had, Mrs. Wright, were of no consequence!' ".

The papers contained in the package thus received from Mrs. Wright, were one of the instruments here propounded, together with several other unexecuted papers.

From Mrs. Wright's house, on the same evening, August 30th, 1864, Mr. Forman went to the residence of Mrs. Westervelt, to whom the other instrument here propounded had been entrusted. Mrs. Westervelt says, "He called for the papers she left with me. * * *. He spoke of the will. * * * He had the package of papers from Mrs. Wright; he told me so, and that he wanted

those I had, and I told him that I could not give them to him; that I had no power to do so, and he said, he must have them, and that Mrs. Forman wanted them; she wished to burn them. I said, 'Mr. Forman have you the order?' He said, '*he* was the order.' I said, 'I cannot give them to you, Mr. Forman; I have no power to do so.' I said, 'Mr. Forman, I will go over there with you, and if she is in a frame of mind to have them, I will take them with me.' He said, 'You cannot go; if you do go you cannot see her.' 'Very well,' said I, 'then I cannot give them to you.' Then he said, 'Is it possible that is all the confidence you have in me? if so, I will show you the power I have.' He then went into the back parlor, seated himself, and broke open this envelope, and took out the papers. He said, he would take them out and break the seals until he found one that had my name and Maria Smith's name; he then wanted the other, he said. *   *   * He broke them open until he found the copy like mine, and said, 'Here it is,' holding it up, 'will you give me the other, Mrs. Westervelt?' Upon a moment's reflection, I thought I would, and had better. When he first came in the parlor, when he remonstrated, I said, 'Mr. Forman, if your brother or cousin should have left papers with you, reaching forward, would you give them to me?' He says, 'Mrs. Westervelt, is it money you want? if so state the sum.' Those were the words."

Notwithstanding her imprisonment in the asylum, Mrs. Forman "began to improve decidedly after the first few weeks, after the first month," says Dr. Barstow. *   *   * "She continued in that improved state until next August, or until July or August. The weather was then excessively hot, and I saw she suffered very much from the heat, and began to droop. I think it was about August, 1864. At that time she left off coming to the table; she gave up her walks; gave up her drives; nothing then would induce her to go out; she became very much depressed, and lost her interest in everything; she at times would

refuse her food altogether, and during the last part of August she was fed constantly by her attendant. . On the 26th of August, I remember the date, I went in to see her in the morning, and she seemed very much agitated and excited, quite wild; her manner was not at all like that at first," &c., &c. In the last of August, or first of September, of this year, she was, according to the Doctor's testimony, " in a very low condition."

On the 31st of August, according to the testimony of Dr. Barstow, Mr. Forman came. " He told me (Dr. Barstow) that he had brought the papers that Mrs. Forman wished, and asked me to go in the room with him as he gave them to her. I told him certainly, if he wished it; that I presumed there was no occasion for my going in; he said he preferred that I should. I went in with him, and he handed her the papers. She seemed quite impatient to see him, and received the papers very gladly.

" She took the papers and sat down; I sat down in the room and began to talk with Mr. Forman; she looked over the papers, and some of them she destroyed; tore across two or three times, and threw them down on the floor, and others she laid one side, saying that 'they were of no consequence.' I left the room after that.

" Soon after that, or after the interview was over (I do not remember whether I went in again or not), he brought me the papers; he brought them out in the library and did them up in a package and took them away.

" Afterwards, in a day or two, he brought the package back, and said, ' Here are these papers,' and asked me if I would take charge of them for the present. I told him certainly, and I put them in the desk, and they remained there until the day she died, when he took them away."

I think there can be no doubt that the decedent, at the time she tore up these papers, was under such mental excitement as incapacitated her from forming a reasonable and intelligent intention to revoke her will.

These two instruments in writing propounded as the last will and testament of Anna Maria Forman, deceased, bearing date the 27th February, 1862, must therefore be decreed to constitute her last will and testament, and to have been properly executed, and they must be together admitted to probate as her will.

[From this decree Enos B. Forman appealed to the Supreme Court. At a General Term of the Supreme Court, held the 12th November, 1867, an order was made "That the decree of the Surrogate is hereby reversed, and the case is hereby remitted to the Surrogate to proceed with the probate of the last will and testament of the testatrix, the testimony already taken before the Surrogate to stand, with liberty to either party to introduce new evidence."

The following opinion of the Supreme Court was delivered, upon entering this decree, by his honor Judge Sutherland:

"The Court are of opinion that the two instruments propounded as the will of Mrs. Forman are inconsistent, and cannot be held as together constituting one will. No rule of construction could determine whether there are four or five residuary legatees under the two instruments. The Surrogate should find which of the two instruments, if either, is the will of the testatrix. If he can not determine that, the case, on the part of the proponents, fails for want of proof.

"The decree of the Surrogate must be reversed, and the case remitted to him for a new trial, with costs to abide the event."

The Surrogate thereupon placed the proceeding anew on his calender, took additional testimony (solely upon the question which seemed to have presented a difficulty to the Supreme Court, viz: Which of the two instruments was executed the first), and on the 25th of March, 1868, reaffirmed his former decision, and re-entered a decree of

probate, admitting the two papers as constituting the will.

From this decree Enos B. Forman again appealed to the Supreme Court; and at a General Term of that Court, held July, 1869, the decree of probate was affirmed.]